## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. CR-26-00035-JD |
| | ) |
| MERLIN ENRIQUE SANTOS, | ) |
| | ) |
| Defendant. | ) |

### ORDER

United States Magistrate Judge Suzanne Mitchell entered an order releasing Defendant Merlin Enrique Santos ("Santos") on bond with conditions of release pending his criminal jury trial. [Doc. Nos. 17, 18]. The Court stayed the order, [Doc. No. 25], pending the Government's Motion to Revoke Magistrate Court's Order of Release ("Motion") [Doc. No. 27], which is now before the Court. Santos filed a Response in Opposition to Plaintiff's Motion to Revoke Magistrate Court's Order of Release. [Doc. No. 30]. After careful consideration, and for the reasons explained below, the Court GRANTS the Government's Motion.

### I.      LEGAL STANDARD

The Court reviews de novo a magistrate judge's release order. 18 U.S.C. § 3145(a). That the district judge performs a "de novo determination" does not mandate additional or repeat evidentiary hearings. *United States v. Raddatz*, 447 U.S. 667, 674 (1980). "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). And

so the Bail Reform Act requires the Court to order pretrial release, with or without conditions, unless it determines "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e).

The Government bears the burden of proving risk of flight by a preponderance of the evidence. *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003). On danger to the community, the Government's burden is clear and convincing evidence. *Id.*; *see also* 18 U.S.C. § 3142(f). In making its determination on pretrial release, the Court considers the four factors articulated in 18 U.S.C. § 3142(g):

> (1) the nature and circumstances of the offense charged . . .;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including—
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings
>
> * * *
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

**II.   DISCUSSION**

Santos correctly posits that Congress did not include the charged offense—8 U.S.C. § 1326—among the offenses subject to a rebuttable presumption of detention under § 3142(e)(3). [Doc. No. 30 at 2–3]. No presumption of detention applies here, and the Court proceeds to an individualized assessment of the § 3142(g) factors as they bear on risk of flight and danger to the community.

### A.     The Nature and Circumstances of the Offense Charged

Santos is charged with one count of illegal reentry in violation of 8 U.S.C. § 1326(a). He has been removed from the United States on two prior occasions and each time returned without authorization. *See* [Doc. Nos. 27-4, 27-5].

Santos argues that because Congress excluded § 1326 from the offenses carrying a presumption of detention, the Court should not treat prior removals as dispositive of flight risk or allow them to operate as a "de facto presumption of detention." [Doc. No. 30 at 3]. The Court agrees that no presumption of detention applies and that each case requires individualized assessment. But that assessment must account for the specific circumstances of the charged offense. Santos has been ordered removed, has been removed twice, and has reentered the United States. These facts are relevant to the Court's inquiry not because they establish a presumption, but because they constitute direct evidence of Santos's demonstrated response to federal removal proceedings.

The Government argues that Santos's repeated reentries after removal evince a pattern of defiance and disregard for the authority of the United States. [Doc. No. 27 at 7–8]. Santos responds that removal orders are civil immigration determinations, not an order by an Article III court, and that noncompliance with the former should not be treated as equivalent to noncompliance with the latter. [Doc. No. 30 at 3].

The Court is not persuaded by Santos's distinction. The question under the Bail Reform Act is whether conditions of release can reasonably assure Santos's appearance before this Court. Serial disregard for the lawful orders of one branch of government probes potential disregard of another. Whether Santos would similarly disregard the

3

authority of this Court is precisely the question the Bail Reform Act requires the Court to assess, and his prior conduct is probative of the answer.[1]

Santos also cites data suggesting that undocumented non-citizen defendants released pretrial have lower rates of failure to appear, technical violations, rearrest, and revocation than U.S. citizen defendants or documented non-citizen defendants. [Doc. No. 30 at 4–5]. But population level statistics are of limited utility in an individualized assessment of a particular defendant. The question is whether the totality of the evidence regarding *this* defendant supports detention, and that question cannot be answered by reference to population-level averages. This factor weighs in favor of detention.

### B.     The Weight of the Evidence Against the Defendant

The weight-of-the-evidence factor is relevant to the Court's inquiry only to the extent that it "bear[s] on the risk of nonappearance and the risk of harm to the community." *United States v. Lizardi-Maldonado*, 275 F. Supp. 3d 1284, 1292 (D. Utah 2017).

Here the evidence against Santos is strong. He admitted to ICE officers that he is a citizen of Honduras, that he had been previously deported, and that he reentered the United States without permission. [Doc. No. 27-7 at 1–2]. His immigration records, prior

---

[1] The Court is not aware of any precedent limiting its ability to consider Defendant's prior illegal reentries as a "circumstance" of the offense. The prior entries are requisite to the offense itself. Thus, the Court notes that as border enforcement measures intensify and the consequences of prior removals accumulate, the probability of successful future reentry diminishes. This dynamic cuts toward flight risk: a defendant who perceives diminishing prospects of returning to the United States after a third removal has a correspondingly greater incentive to abscond before that removal occurs.

removal order and removals, and the absence of any record of lawful admission corroborate these admissions.

Santos argues in response that his minimal sentencing exposure—a proffered advisory guideline range of zero to six months—substantially reduces any incentive to flee. [Doc. No. 30 at 2, 5]. That criminal penalty alone may present a limited incentive to flee. But the consequences Santos faces are not confined to his criminal sentence, as an ICE detainer has been lodged. [Doc. No. 27-1 at 1]. Conviction (or acquittal) will be followed by transfer to ICE custody and, in all likelihood, a third removal from the United States. The combination of strong evidence and a likely subsequent removal provides context for the flight-risk assessment that the criminal penalty alone does not capture. This factor weighs in favor of detention.[2]

### C.  History and Characteristics of the Defendant

On community connections, defense counsel represents (1) that Santos has lived with a long-term partner in Oklahoma City since 2019; (2) that the household includes two U.S.-citizen children, ages 15 and 16, for whom Santos serves as a parental figure; and (3) that Santos is employed as a roofer. [Doc. No. 30 at 8–9]. Two letters from the children were submitted describing Santos's role in their lives, and family photographs

---

[2] To the extent the collateral consequences of conviction are beyond the typical scope of this factor, the Court nonetheless considers those consequences as part of the nature and circumstances of the offense. Moreover, the presumption of innocence continues to apply throughout these proceedings, despite the Court's evaluation of the weight of the evidence against Defendant at this stage of the proceedings. *See* 18 U.S.C. § 3142(j).

corroborate the claimed household structure. [Doc. No. 30-1; Doc. No. 30-2].[3] On foreign connections, Santos does not dispute representations that he has ongoing connections to Honduras as a citizen and property owner. [Doc. No. 27 at 11–12].[4] Santos also has immediate family in Honduras with whom he maintains regular contact. *Id.* at 11.

Santos's relevant past conduct includes his use of an alternate identity commensurate with the fraudulent identification card officers located in his personal property after arrest. Santos argues his fraudulent Mexican identification card bears no probative value as to his likelihood to abscond because he "did not present it to agents" or otherwise "attempt to use it to obstruct the investigation." [Doc. No. 30 at 10]. Santos argues that no evidence suggests that "he used this [identification card] to create a clean or durable alternate identity that could facilitate disappearance" and that he simply used it for the purpose of "survival during regional migration." *Id.* at 10–11.

---

[3] The United States Probation Office ("USPO") was unable to independently verify Defendant's address, employment, relationship, or any point of contact in his claimed household. *See* [Doc. No. 15 (sealed)]. Defendant's counsel explained that the partner's identifying information was withheld as a strategic decision to protect her from potential collateral immigration consequences. [Doc. No. 30 at 7–8]. But this decision still presents a practical limitation, as without a verified address the USPO cannot conduct the home visits and compliance checks on which conditions of release depend. GPS monitoring does not cure the problem. It cannot substitute for a verified residence, in-person supervision, and cooperation with probation. Pre-trial supervision is built around a verified address. The USPO must confirm where a defendant lives, conduct home visits, assess who else resides there, and evaluate safety and suitability. If a defendant does not provide a home address, officers cannot verify where he is actually staying or whether the residence complies with court-ordered conditions, such as no firearms. *See, e.g.*, [Doc. No. 17 ¶¶ (3), (7)(k), (7)(u)].

[4] *See also* [Doc. No. 15 (sealed)].

6

First, the fact that Santos did not present the fraudulent identification card to agents in hot pursuit has no bearing on whether he *would have* presented the card had he felt it advantageous to evading apprehension by law enforcement. Second, there is a fundamental timing problem with Santos's "regional migration" argument. Santos does not dispute that he most recently entered the United States in 2020, yet his admittedly fraudulent identification card bears an issue year of 2022. This lends the straightforward inference that he obtained the card after his most recent illegal entry, as presumably a fraudulent identification card with an issue date in the future has little utility. And even if such a card were useful, Santos's reasoning would not explain why he still had the card on or near his person six years after his most recent entry into the United States. Individuals keep items on their person presumably because they intend to use those items.

The record also reflects a pattern of evading law enforcement. In the 2018 domestic incident, Santos fled before police arrived, monitored their presence from a distance, and refused to return until officers departed. [Doc. No. 27-2 at 1]. Immediately before the current arrest, Santos ran across interstate traffic to evade law enforcement. [Doc. No. 27 at 5].

Santos's community connections in Oklahoma weigh against flight risk. On the other side of the ledger, Santos has (1) close connections to a foreign country; (2) a history of using a fictitious alias with a fraudulent identification card; and (3) a history of evading the police and illegally reentering the United States in contravention of a valid removal order. These latter facts outweigh Santos's connections to Oklahoma. His history and characteristics evince risk of flight.

### D. Nature and Seriousness of Danger to the Community

The Government argues that Santos poses a danger to the community on two theories: (1) his repeated illegal reentries constitute continued criminal conduct "to the detriment of the community," and (2) his 2018 domestic violence conviction demonstrates a risk of physical danger. [Doc. No. 27 at 13]. Santos responds that his misdemeanor conviction is dated and isolated and that GPS monitoring and reporting conditions can adequately protect community safety. [Doc. No. 30 at 12–13].

The Court rejects the Government's first theory. The Tenth Circuit's broad construction of community safety in *Cook* addressed the danger posed by drug trafficking—unlawful presence is hardly analogous. *See United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989). If illegal reentry alone established dangerousness by clear and convincing evidence, the standard would be meaningless in every § 1326 prosecution.

The domestic violence record, however, carries weight. Santos strangled his girlfriend during a domestic dispute, restricting her ability to breathe. [Doc. No. 27-2 at 1]. In the lethality assessment, the victim affirmed that Santos had threatened to kill her and that she believed he was capable of doing so. [Doc. No. 27-3 at 1]. The Government represents, and Santos does not contest, that this victim is Santos's current partner—the person with whom he would reside if released. [Doc. No. 27 at 11]. That the offense resulted in a misdemeanor disposition does not diminish the severity of the underlying conduct. GPS monitoring cannot prevent an act of violence against a person in Santos's

own household, nor would more restrictive conditions of release, including curfew, home detention, or home incarceration. This factor weighs toward detention.

### III. CONCLUSION

The Government has shown by a preponderance of the evidence that Santos's (1) repeated reentries after removal, (2) flight from law enforcement, (3) use of a fictitious identity, and (4) verified foreign ties establish that no condition or combination of conditions will reasonably assure his appearance. The Government has also shown by clear and convincing evidence that Santos's release poses a danger that conditions of release cannot adequately mitigate.

For these reasons, the Court GRANTS the Motion to Revoke Magistrate Court's Order of Release [Doc. No. 27]. Defendant Merlin Enrique Santos is committed to the custody of the Attorney General or the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The Defendant shall be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility shall deliver the Defendant to the United States Marshal for the purpose of an appearance in connection with a court proceeding.

IT IS SO ORDERED this 11th day of February 2026.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE